Judgment for the United States on the demurrer.

---

## Case No. 14,664.

### UNITED STATES v. BROWN.

[Hoff. Op. 74; Hoff. Dec. 16.]

District Court, D. California. Sept. 18, 1855.

SPANISH LAND GRANT—SUFFICIENCY OF EVIDENCE —ENFORCEMENT AGAINST UNITED STATES.

[1. A claim under an alleged provisional license granted by a Spanish officer may be properly rejected in the absence of any testimony from the archives to sustain it, it being supported only by parol testimony of witnesses whose perjury has been exposed, and there being no reliable evidence that the land was ever occupied under such license.]

[2. An equity based upon a license by a Spanish officer to occupy provisionally can be enforced against the United States only by one presenting clear proofs that, on the faith of the promise, he occupied and settled the land, and a mere use of the land for pasturage, in common with others, is insufficient.]

[This was a claim by E. L. Brown to eleven leagues of land. Rejected by the board.]

HOFFMAN, District Judge. The documents originally presented by the claimant to the board, and on which he asked a confirmation of his claim, were (1) A petition of Victor Prudhon and Marcos Baca to M. G. Vallejo, director of colonization, dated December 10, 1845, in which they solicited permission to occupy a tract of land, eleven leagues in extent, "as shown by the map annexed to the petition." (2) The marginal order or decree of Vallejo, dated December 10, 1845, in which he requires the usual informe of the alcalde of the jurisdiction of Sonoma. (3) The "informe" of José de la Rosa, dated December 17, 1845. (4) A permission to occupy provisionally, signed by Vallejo and dated December 20, 1845. (5) A formal grant by Pio Pico, dated Los Angeles, December 29, 1845. (6) A certificate of confirmation by the departmental assembly, dated December 30, 1845.

All these documents were produced by the claimant and filed together in the surveyor general's office on February 9, 1852. The archives contain no trace whatever of the existence of this grant. No expediente is found, nor is the grant dated in the book of Toma de Razon for the year 1845, the latest entry in that year being dated December 23d. The records of the departmental assembly not only contain no mention of its approval, but they show that the assembly was not in session at the date when the resolution of approval was said to have been passed. The grant and papers in many particulars closely resemble those in the case of Luco v. U. S. [Case No. 8,594], which was rejected by this court as spurious, and which has since been so declared by the supreme court. [23 How. (64 U. S.) 515.] In both cases the expediente was produced by the claimant. No note appeared in the Toma de Razon. The confirmation nowhere appeared in the journal of the assembly, and was alleged to have been made at a day when that body was not in session, and the signatures of Pio Pico, in both cases, had a most suspicious appearance. Many of the principal persons connected with both claims, either as parties or as witnesses, were the same, and the lands claimed were in both cases in the immediate vicinity of Sonoma. Under these circumstances the court would have had no hesitation in affirming the decree of the board by rejecting the claim as spurious.

The case was, however, after being submitted to the court, opened for further testimony on both sides; and, it having been ascertained that Moreno, by whom the grant was attested as secretary, was not in office at the time it bears date, he was examined as a witness for the United States. He thereupon confessed that neither the signatures of himself, Pio Pico, or Covarubias were genuine, and that he was not in office at the date of the grant. Whether or not the signatures of Moreno and Covarubias are genuine, it is not easy to determine. It is clear that, at all events, they were not affixed to the documents until long after their date. The counsel for the claimant thereupon in open court renounced all claim under the fraudulent grant and certificate of approval, but they still maintain the genuineness and validity of the provisional permission to occupy signed by Vallejo.

As these documents are produced by the claimants connected with and part of an

expediente, the principal papers of which are now admitted to be forged and fraudulent, and as all the witnesses, except Vallejo, who testify to the genuineness of the provisional title, also testify to the genuineness of the forged papers, it is apparent that such testimony can afford no reliable basis for the judgment of the court in favor of the latter. That the petition to Vallejo, the informe of De la Rosa, and the license to occupy it, may have been written long subsequently to these dates, is evident. It is also evident that the witnesses who swear to the genuineness of the grant by Pio Pico, to its reception, etc., and the influences by which it was procured, would be equally ready to swear to other spurious documents. In the absence, therefore, of all testimony from the archives, with no reliable evidence that the land was ever occupied under the alleged provisional license, I should be justified in rejecting a claim supported by parol testimony of witnesses whose perjury has been exposed. But the evidence in support of the provisional grant can be shown to be unreliable, independently of the character of the witnesses or the exposure of the fraudulent character of the grant.

The petition to Vallejo refers, as we have seen, to a map or "diseño" of the land which was annexed to it. Marcos Baca, one of the pretended grantees, swears that a map of the land was made by Alcalde José de los Santos Berreyesa, before the application was made for the land, and in his third deposition the same witness states that Berreyesa was alcalde in 1845. It is evident, therefore, from the petition itself, and from the statement of Baca, that a map, made by Berreyesa, when he was alcalde, accompanied the petition. But, unfortunately, it appears, by the positive testimony of Berreyesa himself, that he was alcalde in 1846, and not in 1845; and this fact is further proved by the documents themselves, for the petition, dated December 10, 1845, is referred, not to Berreyesa as alcalde, but José de la Rosa, by whom, as alcalde, the informe is furnished. It is clear, therefore, that Berreyesa could not, as alcalde, in 1845, have prepared the map to be attached to the petition. As Berreyesa became alcalde in March, 1846, it follows that, if he did prepare the map to accompany the petition, that paper must have been made and presented subsequently to March, 1846, and that it, the informe of De la Rosa, and the license to occupy, are antedated. Berreyesa states, in addition, that he prepared, at the request of Baca, in July, 1846, a torrador or draft of a petition to be presented to himself for permission to occupy the land. If this be so, it negatives the idea that Baca could already, viz. in December, 1845, have obtained a similar permission to occupy from Vallejo.

But it is unnecessary to pursue the subject. As between Berreyesa, who is wholly unimpeached, and whose statements are clear and positive, and Marcos Baca, who, in four different depositions taken in this cause, affirms and reaffirms the genuineness of the forged titles originally relied on in this case, the court cannot for a moment hesitate which to believe. It is impossible to contemplate without disgust the series of perjuries which compose this record. Some of the witnesses who have sworn to the genuineness of the signatures have very possibly fallen into an honest mistake. But the testimony of Marcos Baca, who swears, not only to his reception of the grant shortly after its date, but also that it was obtained through the influence of Antonio Pico, the governor's brother, who wrote to him informing him of the fact; the testimony of José de la Rosa, who swears that this letter was shown him by Baca a few days "after he gave his informe"; the testimony of Cayetano, who swears, not merely to the genuineness of the signatures, but that they were affixed at the date of the grant, and that he knows this from having written the grant himself,—all this testimony, together with (undoubtedly) much of that by which the genuineness of the signatures was sought to be established, must now be admitted to be deliberate perjury. No witness swears to the time when the petition to Vallejo was presented, and his concession obtained, who does not appear, on the face of his own deposition, to have sworn falsely, with the exception of Vallejo himself, whose testimony only refers to the genuineness and date of his own signature; and on this point he is contradicted, as we have seen, by the language of the petition, which refers to a map, and the testimony of Berreyesa which shows when the map was made.

But, assuming that the genuineness of the license to occupy by Vallejo were clearly made out, such a permission could confer no rights, unless Vallejo had power to grant it, and to pledge the faith of the government to perfect the title when the conditions of occupation and cultivation had been complied with. The authority to make preliminary concessions, to which Vallejo appeals, is contained in a letter of instructions to him from Figuerroa, dated June 21, 1835. The object of these instructions is apparent from their tenor. It was, not merely to promote the general policy of Mexico with regard to colonization, but to facilitate and encourage the settlement of the northern frontier, on which the Russians had made an establishment, which already gave the government much uneasiness. It was hoped that, by founding a pueblo at Sonoma, and by encouraging the occupation of the country by Mexican citizens, a check might be put upon the encroachments and apprehended designs of the Russians, and a preponderance in numbers on the part of native citizens secured on the frontier. Whatever might have been the authority possessed by Figuerroa thus to delegate the powers he was, by the law of 1824

and the regulations of 1828, empowered to exercise, it is difficult to perceive any ground for supposing that the faculties thus attributed to Vallejo, not only continued after the death of Figuerroa, but survived the numerous revolutions and radical changes of government which subsequently took place.

In 1836 the federal constitution was overthrown by Santa Anna. California then became a department; the political chief, a governor; and the territorial deputation a departmental assembly. The next year after Figuerroa's death, his successor was expelled, and Alvarado was declared governor, and on the 7th of November, 1836, the territorial deputation passed resolutions asserting the freedom and independent sovereignty of California. The dispute with Mexico seems, however, to have been settled by a compromise. In 1838, Alvarado, who had expelled a governor sent from Mexico, was appointed governor, ad interim, and in 1839, he was recognized as constitutional governor of the department. His successor was Micheltorena, who arrived from Mexico invested with extraordinary powers by Santa Anna. His rule was of short duration, and after an unsuccessful contest, he was, in February, 1845, compelled to abdicate. Pio Pico then assumed control as governor ad interim; but, like Alvarado, he was subsequently recognized as constitutional governor of the central government. Amid the confusion of so distracted and revolutionary a period, it is not easy to determine the precise authority which any officer was by law empowered to exercise. But it may well admit of doubt whether the instructions and the powers given by Figuerroa to Vallejo (a precaution against a danger long passed away, for the Russians had abandoned the country in 1842) can be considered as existing and valid down to the period of the American occupation. It must, at all events, be admitted that, even if Vallejo had authority to confer an inchoate title to lands on the frontier, and to bind the government to make a formal title, such an equity could be enforced against the United States only by one who presented clear and satisfactory proofs that, on the faith of the promise, he had occupied and settled the land, and thus rendered a full consideration to the former government.

On this point the testimony is not only unreliable but insufficient. It is found chiefly in the depositions of Baca and his brothers, and its effect is thus stated by Mr. Commissioner Thompson, who delivered the opinion of the board: "The occupancy proved in this case was nothing more than the exercise of the common right of pasturage, which was enjoyed by all the inhabitants of the country on the public lands; and there is nothing in it going to show any exclusive possession or claim of ownership on which an equity could be founded." In this view of the testimony I entirely concur. The claim must, therefore, be rejected.